**Godofredo HERNANDEZ,**
**Plaintiff–Appellant,**

v.

**SPACELABS MEDICAL INC.,**
**a Delaware Corporation,**
**Defendant–Appellee.**

No. 02–35615.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 2003.

Filed Sept. 11, 2003.

Ricardo A. Guarnero, Seattle, Washington, Reba Weiss, Blair & Meeker, LLP, Seattle, Washington, for the appellant.

Mark Richard Busto, Sebris Busto, P.S., Bellevue, WA, Kristen L. McMichael, Kirby Wilcox, and Paul W. Cane, Jr., Paul Hastings Janofsky & Walker, San Francisco, CA, for the appellee.

Before: REINHARDT, W. FLETCHER and GOULD, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge.

Plaintiff Godofredo "Freddy" Hernandez brings this employment discrimination suit against his employer, Spacelabs Medical, Inc. ("Spacelabs"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Washington Law Against Discrimination ("WLAD"), R.C.W. § 49.60.010 *et seq.* He alleges that he was (1) denied promotions because of

his national origin and (2) fired in retaliation for a sexual harassment complaint he made about his supervisor on behalf of another employee. The district court granted Spacelabs's motion for summary judgment. We affirm the grant of summary judgment on the denial of promotions claims because none of the instances of alleged discrimination occurred within the limitations period. However, we reverse on the retaliatory firing claims because there is sufficient evidence in the record to allow a reasonable jury to infer that Hernandez was fired in retaliation for his complaint.

## I. Background

The factual narrative that follows is based on evidence in the record, taken in the light most favorable to Hernandez, the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–50, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Hernandez is a Hispanic man who was trained in El Salvador as an electromechanical engineer. He began working for Spacelabs at its Chatsworth, California, facility in 1978. He worked as an Assembler II until 1980. After 1980, he received promotions to various levels of inspector, technician, and lead positions. According to Hernandez, he was the highest-placed Hispanic worker on the manufacturing side of Spacelabs from 1981 to 1992.

In 1990, Hernandez was promoted to the position of Technician III–Lead. While in this position, he was responsible for training new technicians. He held this position for less than two years, at which time he was replaced by a white man he had trained, Joe DeCarlo. While Hernandez was supervising DeCarlo, DeCarlo grabbed Hernandez's paystub and expressed outrage that Hernandez was making more money than he was. According to Hernandez, he was demoted after DeCarlo complained about this pay differential. Hernandez states that he was told he was demoted (and that his pay was reduced accordingly) because he "couldn't communicate well in English." Spacelabs had an official language policy that required that all business communications, both oral and written, be conducted in English. Sometime in 1994, Hernandez applied for the position of quality assurance supervisor and was turned down. The position was given to a white man. All of those involved in this hiring decision were white men.

Spacelabs closed its Chatsworth facility in 1996, and employees were offered the opportunity to relocate to Spacelabs's headquarters in Redmond, Washington. Hernandez accepted the relocation offer. Spacelabs agrees with Hernandez that the Chatsworth workforce was "predominantly Hispanic." Spacelabs also relocated workers from its Oregon plants, where, according to Hernandez, the employees were "largely white," to work at the Redmond facility. Hernandez states that one of these employees, a white female manager, told him " 'you Hispanics' [a]re not to touch the Oregon machines."

Once at Redmond, Hernandez applied for a supervisor position. At the time he applied, Hernandez had over twenty years' experience with Spacelabs. The job was given to Andre Zins, a white man who had two years' experience in the company and whom Hernandez had trained. Hernandez also applied for a promotion to the position of machine operator. He filled out an application and submitted it to a manager named T.J. Jeitler. According to Hernandez, Jeitler read the application, looked up at Hernandez and said, "You don't look Oriental to me." Hernandez took his application back and ripped it up. Jeitler later apologized. The position was given to Joseph Huong Vu, an Asian employee. Hernandez then attempted to apply for the sustaining engineer position vacated by

Vu. Hernandez states that he approached the manager in charge of the hiring decision, a white man named Dick Walter, and asked if he was qualified for the position. Walter "just kept looking at me from head to toe arrogantly like why are you even asking this? He didn't answer me. He didn't answer me at all. He just turned around and kept playing with his computer."

In early May 2000, Hernandez believed that a female co-worker, Salita Sam, was being sexually harassed by Ron Pray, who supervised both Sam and Hernandez. At his deposition, Pray admitted to one incident that he thought might have been viewed as harassment, but testified that there were no other incidents. Pray testified that he came across Sam and Reggie Smith, one of Sam's co-workers, joking about how much money Sam would make if she would let Smith "pimp her out." Pray testified that he "made the mistake" of asking whether he would "get a discount as a manager," and that Sam "took that as a wrong way, and assumed I wanted to have sex with her." In a declaration submitted to the district court, Smith denied that he was ever present during such an incident.

Hernandez's version is very different. He states that Pray asked Sam to go out with him, and that he told her "he wanted to fuck her, because he had never fucked a Chinese butt" and that he wanted to "try an Oriental girl." Hernandez states that Sam told him that Pray had approached her during the night shift when she was working alone and asked her to take him home so they could have sex, and that Pray told Sam that he thought she had a "nice ass." According to Hernandez, this harassment upset Sam, and she was seen crying at work on at least two occasions. According to Hernandez, Sam, a single mother, was afraid to report the harass-

ment herself because she thought she would be fired.

After seeing Sam crying, Hernandez approached her to find out what was wrong. According to Hernandez, Pray saw the two talking and "directed [Hernandez] to go elsewhere." Hernandez states that Pray's attitude toward Hernandez "became more hostile after he saw [Hernandez] speaking with Ms. Sam" and that Pray "pulled [Hernandez] aside and in an angry tone stated, 'why are you always talking to her' and 'you are taking too much time talking to her.'" Hernandez also states that Pray "made it clear [to Sam] that he was unhappy that she was confiding in [Hernandez]," and that Sam warned him to "stay away from [her]" because "Ron[wa]s watching [her]."

Hernandez reported Pray's behavior to Cathy Lasher, the manager of Spacelabs's human resources department, on May 2, 2000. Hernandez states that Lasher approached him on that date and told him that Pray was "unhappy" with him, prompting him to reveal Pray's alleged harassment of Sam and his interaction with Hernandez. After he told this to Lasher, Hernandez told Alan Flores, one of his supervisors, that he had done so. According to Hernandez, Flores's reply was that Hernandez was now in trouble and that "Pray told me to shut up, I'm your boss and this is none of your business." Hernandez also revealed the fact that he reported Pray's alleged harassment to other co-workers. He states that he discussed the issue with Sarkis Babajany, and Babajany confirmed that this conversation took place in a declaration submitted to the district court. Hernandez asserts that this discussion was over-heard by Michael Lee, an employee who "had a very good relationship with Ron Pray [and] would always inform Mr. Pray about

what was going on in Factory Repair when Mr. Pray was not there."

After receiving the report from Hernandez on May 3, Lasher began an investigation and confronted Pray with the harassment allegations. On May 26, 2000, Hernandez was terminated. His termination letter gave the following reasons for the termination:

- On March 27, 2000, you completed the repairs on a 90486 customer unit and placed it on the ship shelf to be returned to the customer. The unit was missing hardware (per the bill of material).
- On March 28, 2000, you turned in two Factory repair Travelers for 90518 power supplies that you had repaired.... [B]oth of the power supplies which you confirmed that you had repaired, failed to operate. The assemblies were missing components, which made them non-functional.
- On May 5, 2000, you completed the repairs on two 90486 customer units and placed them on the ship shelf. They were missing hardware.
- On May 11, 2000, you completed the repairs on three 90486 customer units, placed them on the ship shelf, and they were also missing hardware.

The letter stated that these were "extremely serious violations of corporate procedures" and that "[w]e have concluded that a continuation of your employment is not in the best interest of the company and are terminating your employment effective May 26, 2000." The termination letter also noted that Hernandez had previously been suspended without pay for "incorrectly updating software and inappropriately documenting travelers," and that this suspension had included a warning that Hernandez's "employment would be terminated should any procedural violations occur in the future."

Both parties agree that Pray made the initial decision to terminate Hernandez,

that Pray prepared Hernandez's termination letter, and that Lasher and Bill Reeves, Pray's supervisor, were involved in the procedures leading up to the termination. At his deposition, Reeves confirmed that "it was Ron Pray's recommendation" to terminate Hernandez. He further testified that "it was clear to [him], based on the facts as presented by Ron Pray, that [Hernandez's] termination was warranted." He testified that "Ron may have written up the current violations that I reviewed, which by themselves would have warranted termination, and in addition told me verbally about a history of violations of exactly the same nature."

At her deposition, Lasher recounted that she had received an email from Reeves concerning Hernandez's termination. In it, he asked, "Can we get this termination done this week? Ron tells me there is plenty of history documented. It's becoming a morale issue for other employees. Is there anything I can do? Shall I review his file?" At his deposition, Pray testified that he spoke to Reeves "briefly" about wanting to terminate Hernandez "just [to let] him know basically that [he] was drafting a letter ... with this information.... I didn't give him detail. I basically told him the gist of what it was."

According to Hernandez, he did not make the errors recounted in the letter. Spacelabs contends that the errors on which it relied in the termination letter were reported by Smith to Flores, who in turn reported them to Pray. It relies on Flores's deposition testimony to support this contention. Smith, however, denied in his declaration that he reported any such mistakes by Hernandez. Smith stated that he had reported some missing screws, but that Hernandez was on vacation during the time period covered by these reports. Smith also corroborated a state-

ment by Hernandez that the 90518 is not a power supply but a multi-gas analyzer, and that the allegation regarding Hernandez's deficient performance with respect to the 90518 units was "impossible and could not have happened." The only other evidence proffered by Spacelabs to substantiate the facts alleged in the termination letter is the testimony of Pray.

Hernandez also states that even if he had done the things recounted in the termination letter, Spacelabs never would have terminated an employee for those reasons. Hernandez states that Spacelabs employees "were not required to attach the bracket or power cord to the ... units if the unit was sent from the customer without them [because they] cannot fit in its shipping foam with the power cord or bracket attached to it." Smith confirmed this in his declaration. Hernandez asserts he was instructed by Pray to "send the 90486 unit back how [he] received it." Smith and Babajany each corroborated this. Smith explained in his declaration that if he had noticed a missing power cord or a bracket he would not have brought it to management's attention because a missing power cord or bracket would not indicate a violation of corporate procedure, and that missing screws were a "common oversight."

The district court granted summary judgment to Spacelabs on all claims. Hernandez timely appealed. We review the district court's grant of summary judgment de novo. *Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002). We review the statute of limitations question de novo as well. *Ellis v. City of San Diego,* 176 F.3d 1183, 1188 (9th Cir.1999). In determining whether Spacelabs is entitled to summary judgment, we review the record as a whole and draw all reasonable inferences in favor of Hernandez to determine whether there are any genuine issues of material fact. *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097;

*Oliver,* 289 F.3d at 626. Summary judgment is appropriate where there is no genuine issue of material fact to be determined at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If Spacelabs has carried its burden of production, Hernandez must produce evidence in response. In that event, he cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nissan Fire & Marine Ins. Co., v. Fritz Cos.,* 210 F.3d 1099, 1103 (9th Cir.2000).

## II. Discussion

 *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the legal framework for our analysis of Hernandez's claims. *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123 (9th Cir.2000); *Ruggles v. Cal. Polytechnic State Univ.,* 797 F.2d 782, 784–85 (9th Cir.1986). If Hernandez establishes a prima facie case, the burden of production shifts to Spacelabs to articulate a legitimate nondiscriminatory reason for the adverse employment action at issue. If Spacelabs proffers such a reason, Hernandez must proffer evidence to support a finding that Spacelabs's reason is pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang,* 225 F.3d at 1124 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). To make this showing of pretext, Hernandez may rely on the evidence proffered in support of his

prima facie case. *Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097. A factfinder may infer the ultimate fact of retaliation without proof of a discriminatory reason if it rejects a proffered nondiscriminatory reason as unbelievable. *See Raad v. Fairbanks N. Star Borough Sch. Dist.,* 323 F.3d 1185, 1193–94 (9th Cir.2003).

The district court noted that Washington has "largely adopted the federal protocol announced in *McDonnell Douglas* for evaluating motions for judgment as a matter of law in discrimination cases brought under state and common law, where the plaintiff lacks *direct* evidence of discriminatory animus." *Hill v. BCTI Income Fund–I,* 144 Wash.2d 172, 23 P.3d 440, 446 (2001). The discussion that follows applies to Hernandez's retaliation claims under both federal and state law. To the extent Hernandez's federal retaliation claim survives summary judgment, so does his WLAD retaliation claim.

### A. Hernandez's Retaliation Claims

#### 1. Prima Facie Case

▮ Title VII protects the right to be free from certain types of forbidden discrimination, as well as the right to speak out against such discrimination. It also protects against retaliation for the exercise of the right to speak out against discrimination. To establish a prima facie case for a retaliation claim under Title VII, Hernandez must show: (1) that he engaged in a protected activity, (2) that he suffered an adverse employment action, and (3) that there is a causal link between the two. *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994). There is no dispute that Hernandez satisfies the first two elements. He has shown that he (1) reported Pray's sexual harassment of Sam to human resources manager Lasher and (2) was terminated.

▮ The district court, however, held that Hernandez failed to establish the third element because he failed to show that Pray was aware that Hernandez had engaged in protected activity. In the district court's view, this "eviscerate[d]" Hernandez's retaliation claim because it prevented a finding of a causal connection between the protected activity and the termination. We disagree. In our view, Hernandez provided sufficient evidence from which a reasonable jury could infer both that Pray either knew or suspected that Hernandez had reported the alleged harassment to Lasher, and that there was a causal connection between this knowledge or suspicion and Hernandez's termination. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir.2000); *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982).

Spacelabs concedes that Pray knew, prior to Hernandez's termination, that allegations of his harassment had been brought to Lasher's attention. Indeed, it is uncontested that at the time of Hernandez's termination Lasher had confronted Pray with such allegations, and Pray knew that the allegations dealt with his alleged harassment of Sam. Spacelabs contends, however, that Pray had no knowledge that Hernandez was the one who reported the alleged harassment, and that Pray's action in terminating Hernandez therefore could not have been retaliation. Spacelabs points out that Pray testified that Lasher did not tell him who had made the sexual harassment allegation, and that Lasher testified that she did not reveal Hernandez's identity as the complainant to Pray. Spacelabs further points out that Reeves testified that he was unaware of Hernandez's complaint against Pray at the time Hernandez was terminated.

What-did-he-know-and-when-did-he-know-it questions are often difficult to answer, and for that reason are often inap-

propriate for resolution on summary judgment. It is frequently impossible for a plaintiff in Hernandez's position to discover direct evidence contradicting someone's contention that he did not know something, and Hernandez has no such evidence. But Hernandez has introduced substantial circumstantial evidence. A reasonable jury could infer from Hernandez's evidence both that Pray believed that Hernandez and Sam had discussed Pray's conduct toward Sam, and that Pray was upset about the fact that Hernandez knew about his conduct. A reasonable jury could also infer that once Pray learned that someone had made a harassment complaint to Lasher, he knew or suspected that this person was Hernandez and decided to retaliate against him. Hernandez's co-workers—including Lee, who was extremely close to Pray, and Flores, a supervisor who also reported to Pray—knew that Hernandez had reported the harassment. A jury could believe Pray's version of events rather than Hernandez's, but Hernandez's burden at this stage simply is one of production. He has produced sufficient evidence which, if credited by the jury, would satisfy his burden of establishing a prima facie case. No more is required.

Spacelabs argues that even if a causal link may be inferred, Hernandez's prima facie case is deficient because the involvement of Reeves and Lasher in Hernandez's termination was sufficient to break the chain of causation and remove any taint of Pray's retaliatory intent. *See Sherrod v. American Airlines*, 132 F.3d 1112, 1122 (5th Cir.1998) ("The causal link . . . can be severed if there is evidence that the ultimate decision maker did not merely 'rubber stamp' the recommendation of the employee with knowledge of the protected activity. . . ."). The parties do not dispute that Pray instigated the termination. Nor do they dispute that Lasher and Reeves both subsequently played roles in the process. They only dispute the significance of their respective roles.

Reeves testified that the final termination decision was made by Lasher, two other human resources employees, Holly Borden and Jim DeGroodt,[1] and himself. But nothing in the record indicates that their involvement amounted to a substantive review of the basis for the termination. Reeves stated he had "reviewed" the basis for the termination, but there is nothing in his testimony to indicate that this means anything more than that he reviewed the list of alleged violations provided by Pray. Nor does Lasher's involvement in the termination appear to be sufficient, on summary judgment, to absolve Pray. Reeves testified that it was the "practice at Spacelabs that HR always prepares the final letter from the manager, from the supervisor" and that he "assume[d] it was Cathy Lasher who put [the allegations] together in one letter in a chronological order." Pray himself testified that Lasher did not conduct an independent review of the facts underlying the termination. Even if she had, Pray explained, she was not qualified to determine whether a piece of equipment had been properly repaired. "She was a human resource employee, not a technician," Pray explained, "she wouldn't have a clue what she was looking at." Considering the facts in the light most favorable to Hernandez, as we must, we conclude that Spacelabs simply has not proffered sufficient evidence to compel a conclusion that the chain

---

1. Spacelabs does not refer to Borden or De-Groodt by name in their brief to this court, but does refer to "upper management" being involved in the decision to terminate Hernan-dez. However, Spacelabs does not point to anything in the record indicating that "upper management's" involvement broke the chain of causation.

of causation was broken by the involvement of any other Spacelabs decisionmaker.

### 2. Proffered Reasons for Termination

Because Hernandez has met his burden with respect to the prima facie case, we move to the next stage of the *McDonnell Douglas* analysis and consider Spacelabs's proffered reasons for Hernandez's termination. Spacelabs asserts that it terminated Hernandez because of the alleged performance deficiencies recounted in the termination letter. This assertion satisfies Spacelabs's burden of producing a legitimate, nondiscriminatory reason for its adverse employment action.

### 3. Pretext

■ Because Spacelabs has proffered a legitimate, nondiscriminatory reason, Hernandez must introduce evidence from which a reasonable jury could infer that Spacelabs did not fire him for those reasons, but rather fired him in retaliation for reporting Pray's alleged sexual harassment of Sam. Hernandez can demonstrate that Spacelabs's proffered reasons for firing him are pretextual "either directly by persuading the court that [the retaliatory] reason [for the decision] more likely motivated [Spacelabs] or indirectly by showing that [Spacelabs's] proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. Hernandez has sufficiently demonstrated pretext through both routes.

First, Hernandez has proffered evidence from which a reasonable jury could infer that the real reason was retaliation. He has proffered evidence about the suspicious timing of his termination, about Pray's knowledge or suspicion that Hernandez had told Lasher of Pray's alleged harassment of Sam, about Pray's hostility toward Hernandez, and about Flores's statement that Hernandez was in trouble when he revealed that he had brought the alleged harassment to Lasher's attention.

Second, Hernandez has proffered evidence from which a reasonable jury could conclude that Spacelabs's proffered reasons, even considered by themselves, are unsupported and pretextual. He has proffered evidence that, if credited, shows that he did not commit the alleged errors recounted in the termination letter. Spacelabs contends that whether Hernandez actually did fail to repair the units is irrelevant so long as Spacelabs's decisionmakers actually believed that he had failed to repair them. *Gill v. Reorganized Sch. Dist. R–6,* 32 F.3d 376, 379 (8th Cir.1994) ("We are not concerned with the correctness or wisdom of the reason given for the [adverse employment] decision, but only with whether [the proffered reason] was the real reason for [plaintiff's] termination and not a pretext for [retaliation]." (internal quotation marks omitted)). Spacelabs's contention is valid as far as it goes. But Hernandez also has produced evidence that, if credited, shows that even if he did commit the errors recounted in the termination letter, they do not amount to infractions that would lead to termination.

We therefore conclude that Hernandez's retaliation claims survive Spacelabs's motion for summary judgment.

### B. Hernandez's Failure to Promote Claims

Hernandez alleges that he was denied promotion to various positions at Spacelabs because he is Hispanic. We conclude that these claims are untimely under both federal and state law. The statute of limitations for Title VII actions is 300 days prior to the filing of a state administrative charge. 42 U.S.C. § 2000e–5(e)(1). Hernandez filed administrative charges with the Washington State Human Rights Com-

mission and the EEOC on August 18, 2000; incidents occurring prior to October 23, 1999, therefore are time-barred under Title VII. A three-year limitations period applies to claims brought under the WLAD. R.C.W. § 4.16.080. Hernandez filed his complaint on August 30, 2001. Accordingly, any claim based on an incident occurring prior to August 30, 1998, is time-barred under Washington law.

None of the allegedly discriminatory promotion decisions occurred within the limitations periods for either federal or state law. Hernandez alleges seven specific instances in which Spacelabs failed to promote him. There is no dispute that the first two, DeCarlo's replacement of Hernandez in 1993 and Spacelabs's failure to promote Hernandez to the position of quality assurance supervisor in 1994, occurred outside both periods.

Spacelabs has tendered company records for the remaining incidents in the form of personnel change notices. These records establish that these incidents occurred outside the limitations periods. The documents submitted to the district court show that: (1) Curtis Riley was promoted on October 28, 1996; (2) Joseph Huong Vu was promoted on December 20, 1997; (3) Vu's position was filled by Jim Allread on January 17, 1998; (4) Andre Zins was promoted on August 8, 1998; and (5) Brian Cavenah was promoted to the lead position on August 22, 1998.

 Hernandez asserts that several of these incidents occurred in "late 1998" or 1999. However, he offers no support for these asserted dates other than his declaration. Indeed, he offers no specific dates for any of the actions. Hernandez's conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Spacelabs therefore is entitled to summary judgment on Hernandez's failure to promote claims.

### III. Conclusion

Summary judgment in favor of Spacelabs would be appropriate on Hernandez's retaliation claim if "no rational fact-finder could conclude that [Spacelabs's] action was discriminatory." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. Because Hernandez has proffered evidence from which a reasonable factfinder could find that Spacelabs fired him in retaliation for reporting Pray's sexual harassment, the judgment of the district court is REVERSED as to Hernandez's retaliatory firing claims. It is otherwise AFFIRMED. Costs on appeal to Hernandez.