**DATAQUILL LIMITED, Plaintiff–Counterdefendant,**

v.

**HIGH TECH COMPUTER CORP., Defendant–Counterclaimant.**

**Case No. 08cv543–IEG (BGS).**

United States District Court, S.D. California.

Dec. 1, 2011.

Greg Smith, Rhett Dennerline, Competition Law Group LLC, Chicago, IL, Gregory S. Markow, The Markow Law Group, San Diego, CA, for Plaintiff-Counterdefendant.

Frederick William Kosmo, Jr., Wilson Turner Kosmo LLP, San Diego, CA, Robert A. Van Nest, William Sellers Hicks, Leo L. Lam, Stacy S. Chen, Eugene Morris Paige, Keker & Van Nest, LLP, San Francisco, CA, Gregory A. Duffey, Peter J. Chassman, Winston & Strawn LLP, Houston, TX, for Defendant-Counterclaimant.

## ORDER

(1) **GRANTING IN PART AND DENYING IN PART HTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON–INFRINGEMENT** [Doc. No. 133]

(2) **DENYING HTC'S MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT** [Doc. No. 130]

(3) **GRANTING IN PART AND DENYING IN PART HTC'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF JOSEPH GEMINI** [Doc. No. 129]

IRMA E. GONZALEZ, Chief Judge.

Presently before the Court is Defendant High Tech Computer Corp. ("HTC")'s motion for partial summary judgment of non-infringement, motion for summary judgment of no willful infringement, and motion to exclude the expert opinions of Joseph Gemini. [Doc. Nos. 129, 130, 133.] For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for partial summary judgment of non-infringement; **DENIES** HTC' motion for summary judgment of no willful infringement; and **GRANTS IN PART** and **DENIES IN PART** HTC's motion to exclude the expert opinions of Joseph Gemini.

## BACKGROUND

This is a patent infringement case concerning two patents. On May 2, 2000, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 6,504,304 ("the '304 Patent") to Plaintiff DataQuill Limited ("DataQuill"). U.S. Patent No. 6,504,304 (filed May 2, 2000). On November 21, 2006, the USPTO issued U.S. Patent No. 7,139,591 ("the '591 Patent") to DataQuill. U.S. Patent No. 7,139,-591 (filed Nov. 21, 2006). The '591 Patent is a continuation of the '304 Patent. *See id.* The technology at issue for both patents generally relates to handheld mobile devices with remote access capability and optional features such as touch sensitive screens or integrated cameras.

On March 24, 2008, DataQuill filed the present action against HTC alleging infringement of the '304 patent and the '591 patent. [Doc. No. 1, *Compl.*] Specifically, DataQuill alleges that HTC devices with the Android Operating System and HTC devices with the Microsoft Windows Phone 6.5 and 7.0 Operating Systems infringe certain claims of the patents-in-suit. [Doc. No. 149–4, *Verified Expert Report of Dr. Daniel Van der Weide ("Van der Weide Expert Report")* at 5–6.]

Prior to the filing of the present action, the USPTO granted third-party requests for ex parte reexamination of both the '304 Patent and the '591 Patent. [Doc. No. 130–2, *Declaration of William Hicks ("Hicks Decl.")* Exs. 1–2.] On April 1, 2008, the USPTO issued two non-final office actions rejecting all of the claims of the '304 Patent and the '591 Patent in light of certain prior art. [*Id.* Exs. 3, 8.] On May 14, 2009, the Court stayed the action pending the reexamination proceedings. [Doc. No. 29.] On October 27, 2009,

the USPTO issued a reexamination certificate for the '591 Patent, and on April 13, 2010, the USPTO issued a reexamination certificate for the '304 Patent. '591 Patent (reexamination certificate) (filed Oct. 27, 2009); '304 Patent (reexamination certificate) (filed Apr. 13, 2010). On April 1, 2010, the Court lifted the stay in light of the conclusion of the reexamination proceedings. [Doc. No. 43.]

The parties agree that as a result of the reexamination proceedings, five of the asserted claims of the '304 Patent—claims 83, 86, 101, 113, and 115—were original claims of the patent that survived the reexamination proceedings, and therefore have an effective date of May 2, 2000. [Doc. No. 130–1 at 2; Doc. No. 151 at 3.] The parties also agree that the remaining asserted claims of the '304 Patent were added during the reexamination proceedings and have an effective date of April 13, 2010 and all of the asserted claims of the '591 Patent were added during the reexamination proceedings and have an effective date of October 27, 2009. [Doc. No. 130–1 at 2–3; Doc. No. 151 at 3.] DataQuill alleges that HTC began selling infringing products in September 2008 with the introduction of its "G1" Android mobile phone. [Doc. No. 151 at 1; *see also* Doc. No. 135–2, *Expert Report of Joseph Gemini* ("*Gemini Expert Report*") at 6.]

## DISCUSSION

### I. Motion for Partial Summary Judgment of Non–Infringement

HTC moves for partial summary judgment of non-infringement on several grounds. HTC summarizes these grounds and its arguments in support as follows:

1. HTC requests that the Court enter summary judgment of no direct infringement with respect to claims 12, 13, 44, 45, 83, 98, 113, and 115 of the '304 patent and all claims dependent therefrom. To satisfy the limitations of these claims, DataQuill relies on third-party software, server functionality, and/or other provisions over which HTC exercises no control or direction, and for which DataQuill has proffered no evidence (and indeed has not even argued) that such limitations are met by any of HTC's accused products or any activity conducted by HTC. Thus, summary judgment of non-infringement is warranted as to these claims.

2. HTC requests that the Court enter summary judgment of no direct infringement with respect to all claims of the '304 patent for all of HTC's accused products except the Evo 4G, as DataQuill has failed to even identify the "controller" or otherwise state how HTC's accused products meet the "controller" limitation of the asserted claims of the '304 patent.

3. HTC also requests that the Court enter summary judgment of no indirect infringement with respect to all asserted claims of the patents-in-suit, because DataQuill has failed and is unable to come forward with any evidence that could meet the legal requirements for either contributory infringement or active inducement of infringement by HTC.

[Doc. No. 133–1 at 1 (emphasis in original).]

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears "the initial responsibility of informing the district court of the basis for its motion." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. To satisfy this burden, the movant must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322, 106 S.Ct. 2548. Where the moving party does not have the ultimate burden of persuasion at trial, it may carry its initial burden of production in one of two ways: "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1106 (9th Cir.2000). To withstand a motion for summary judgment, the non-movant must then show that there are genuine factual issues which can only be resolved by the trier of fact. *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 738 (9th Cir.2000). The nonmoving party may not rely on the pleadings alone, but must present specific facts creating a genuine issue of material fact through affidavits, depositions, or answers to interrogatories. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1112 (9th Cir.2003). However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *Id.; Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir.

2008). Moreover, the court is not required " 'to scour the record in search of a genuine issue of triable fact,' " *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (citations omitted), but rather "may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001).

**B. Direct Infringement**

HTC argues that it is entitled to summary judgment of no direct infringement of various claims of the '304 Patent. [Doc. No. 133–1 at 8–12.] Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... infringes the patent."

■ A patent infringement analysis proceeds in two steps. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577. In the first step, the court construes the asserted claims as a matter of law. *See id.* In the second step, the factfinder compares the claimed invention to the accused device. *Id.; see also Verizon Servs. Corp. v. Cox Fibernet Va., Inc.,* 602 F.3d 1325, 1340 (Fed.Cir. 2010) ("A determination of infringement is a question of fact...."). " 'Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents.' " *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.,* 505 F.3d 1371, 1374–75 (Fed.Cir.2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364 (Fed.Cir.2005)).

■ "To prove literal infringement, the patentee must show that the accused device contains every limitation in the as-

serted claims. If even one limitation is missing or not met as claimed, there is no literal infringement." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1308 (Fed.Cir.2002) (quoting *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed.Cir.1998)). Specifically, "[t]o infringe an apparatus [or system] claim, the device must meet all of the structural limitations."[1] *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311–12 (Fed.Cir.2005); *see also, e.g., Centillion Data Sys., LLC v. Qwest Communs. Int'l,* 631 F.3d 1279, 1283–84 (Fed.Cir. 2011) (using the same standard to analyze infringement of both system claims and apparatus claims). Direct infringement may be proven through circumstantial evidence. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed.Cir. 2009).

*1. The "reading sensor" limitation of claims 12, 13, 44, 45, and 83 of the '304 Patent*

HTC argues that it is entitled to summary judgment of no direct infringement of claims 12, 13, 44, 45, and 83 of the '304 Patent. [Doc. No. 133–1 at 8–11.] HTC argues that all of these claims contain the limitation of a "reading sensor" and that DataQuill contends that the "reading sensor" limitation is met by the digital camera on HTC's devices combined with third-party software. [*Id.* at 8.] HTC further argues that because it does not sell or offer to sell this third-party software, it is not liable for direct infringement. [*Id.*]

■ Claims 12 and 44 of the '304 Patent are dependent claims that contain the limitation of "wherein said reading sensor is a motion detector or scanning device." '304 Patent (reexamination certificate) col. 1 l. 59–62, col. 3 l. 4–6. Claims 13 and 45 of the '304 Patent are also dependent claims that add the limitation of "wherein said scanning device is a camera." '304 Patent col. 19 l. 9–10, col. 25 l. 15–16. DataQuill's technical expert Dr. Van der Weide states in his expert report that all of the accused HTC handsets possess a digital camera that is capable of sensing and capturing an image. [Doc. No. 149–4, *Van Der Weide Expert Report* at 3–4, 10.] Dr. Van der Weide contends that these digital cameras satisfy the above claim limitations. [*Id.* Ex. D at 18, 20.] Therefore, DataQuill has created a genuine issue of fact as to whether the digital cameras on HTC's accused handsets satisfy the above limitations in claims 12, 13, 44, and 45. Indeed, HTC concedes in its reply brief that it is not entitled to summary judgment on DataQuill's "camera theory" of infringement. [*See* Doc. No. 163 at 1.]

■ In addition to concluding that infringement is satisfied by the presence of a digital camera, DataQuill's technical expert concludes in the alternative that the ac-

---

1. In its motion, HTC argues that direct infringement "requires a party to perform or use each and every step or element of a claimed method or product." [Doc. No. 133–1 at 6 (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed.Cir.2007)).] Although HTC accurately cites *BMC Resources, BMC Resources* is a case explaining the standard for direct infringement of "process patent or method patent claims." 498 F.3d at 1378. The claims at issue in this case are system and apparatus claims, not method claims. *See* '304 Patent, '591 Patent; *cf. Hewlett–Packard Co. v. Bausch & Lomb*, 909 F.2d 1464, 1468 (Fed.Cir.1990) ("apparatus claims cover what a device is, not what a device does"). "[A] rule that governs infringement of a method claim may not always govern infringement of an apparatus claim." *Cross Med.*, 424 F.3d at 1311; *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed.Cir.2010) (stating that system claims "do not require the performance of any method steps"). Therefore, the direct infringement standard for apparatus claims from *Cross Medical* applies to the present case, not the standard from *BMC Resources*.

cused HTC handsets infringe the above claims when they are combined with third-party applications such as Google Goggles, Google Shopper or ShopSavvy. [*See* Doc. No. 149–4, *Van Der Weide Expert Report* Ex. D at 18, 20 (stating "[o]r for example, HTC devices with apps like Google Shopper/Goggles or ShopSavvy, can also scan bar codes" in the claim charts for claims 12, 13, 44, and 45).] HTC argues that even if the Court accepts DataQuill's "camera theory" of infringement, it is entitled to summary judgment of no infringement to the extent DataQuill bases its infringement theory on the presence of these third-party applications. [Doc. No. 163 at 1–2.]

Claims 12, 13, 44, and 45 of the '304 Patent are apparatus or system claims. As previously stated, to infringe an apparatus or system claim, the device must meet all of the structural limitations. *See Cross Med.*, 424 F.3d at 1311–12. Further, "[t]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed.Cir.2001). Therefore, if DataQuill contends that the accused devices infringe only when they are installed with certain third-party applications, DataQuill must show that HTC makes, uses, offers to sell, or sells the accused devices with those third-party applications installed.

HTC has presented a declaration by its technical expert Mark Lanning stating that HTC does not provide the accused devices pre-loaded with Google Goggles, Google Shopper, or Shop Savvy. [Doc. No. 133–3, *Declaration of Mark R. Lanning* ("*Lanning Decl.*") ¶ 8.] HTC also notes that DataQuill's technical expert does not state in his report that these applications are pre-loaded on the accused devices and only states that they are avail-able for download. [Doc. No. 163 at 2; see Doc. No. 149–4, *Van Der Weide Expert Report* Ex. D at 10–11 n. 1.] In response, DataQuill has presented a HTC press release for the "G2" accused handset stating that the "G2" is "packed with Google applications such as ... Google Goggles." [Doc. No. 145, *Declaration of Greg Smith* ("*Smith Decl.*") Ex. 13 at 733.] DataQuill has also presented a user guide for the "G2" containing instructions on how to use Google Goggles. [*Id.* Ex. 12 at 550, 552, 557–59.]

HTC admits that this evidence presented by DataQuill is sufficient to create a genuine issue of fact as to whether HTC makes and sells the "G2" handset pre-loaded with Google Goggles. [Doc. No. 163 at 1–2.] However, HTC argues that this evidence is insufficient to create a genuine issue of fact with respect to the other accused devices. [*Id.*] In response, DataQuill argues that this evidence is sufficient to rebut the assertion in Dr. Lanning's declaration that no HTC devices are pre-loaded with Google Goggles, Google Shopper, or Shop Savvy. However, the Court agrees with HTC. To rebut HTC's motion for summary judgment, DataQuill was required to point to facts in the record that demonstrate a genuine issue of fact. *See Reese*, 208 F.3d at 738. Even though infringement may be proven through circumstantial evidence, *see Lucent*, 580 F.3d at 1318, the evidence presented by DataQuill is insufficient to show that the other accused HTC handsets were pre-loaded with Google Goggles. It is not reasonable for a jury to assume that all of the approximately 30 accused devices are pre-loaded with Google Goggles based solely on evidence that it may have been pre-loaded onto the "G2." Therefore, because DataQuill has presented insufficient evidence to show that the other accused devices come pre-loaded with Google Goggles, DataQuill has only created a genuine

issue of fact as to whether the "G2" is pre-loaded with Google Goggles and that the presence of this application infringes the above claims. Accordingly, to the extent DataQuill's theory of direct infringement of claims 12, 13, 44, and 45 requires that the accused devices are loaded with third-party applications, HTC is entitled to summary judgment of no direct infringement with respect to all the accused devices except the "G2."

Claim 83 of the '304 Patent is an independent claim that contains the limitation "a reading sensor ... wherein a [*sic* ] said reading sensor is for reading coded data ... wherein said coded data comprises bar codes and/or binary dot codes and said sensor is a bar code and/or dot code reader." '304 Patent (reexamination certificate) col. 13 l. 26–61. DataQuill's theory of infringement for this claim limitation is similar to its theory of infringement for claims 12, 13, 44 and 45, except that for claim 83, DataQuill contends that infringement occurs only when the accused devices are loaded with third-party applications, such as Google Goggles, Google Shopper, and Shop Savvy. [Doc. No. 149 at 3; *see* Doc. No. 149–4, *Van der Weide Expert Report* Ex. D at 11–12.] Therefore, the analysis in the preceding paragraph also applies to claim 83. DataQuill has created a genuine issue of fact only as to whether the "G2" is pre-loaded with Google Goggles, but has not created a genuine issue of fact with respect to all the other accused devices. Accordingly, HTC is entitled to summary judgment of no direct infringement of claim 83 with respect to all the accused devices other than the "G2."

In sum, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for summary judgment of no direct infringement of claims 12, 13, 44, 45, and 83 of the '304 Patent. Specifically, the Court **DENIES** the motion with respect to direct infringement of claims 12, 13, 44, and 45 to the extent that infringement is alleged to occur solely due to the presence of a digital camera in the accused devices and not the presence of third-party applications. The Court **DENIES** the motion with respect to direct infringement of claims 12, 13, 44, and 45 by the "G2" handset to the extent that infringement is alleged to occur when the "G2" is loaded with third-party applications. The Court **GRANTS** the motion with respect to direct infringement of claims 12, 13, 44, and 45 by all the accused devices other than the "G2" handset to the extent that infringement is alleged to occur when the devices are loaded with third-party applications. The Court **DENIES** the motion with respect to direct infringement of claim 83 by the "G2" handset. The Court **GRANTS** the motion with with respect to direct infringement of claim 83 by all the accused devices other than the "G2" handset.

### 2. The "processing center" limitation of claims 98, 113, and 115 of '304 Patent

■ HTC argues that it is entitled to summary judgment of no direct infringement of claims 98, 113, and 115 of the '304 Patent because DataQuill has not shown that HTC uses or controls the third-party servers that are required to satisfy the claim limitation of "programs in said data entry device are updateable remotely from a processing center." [Doc. No. 133–1 at 11.] In response, DataQuill argues that these claims only require that the device be capable of interacting with a processing center, not that the processing center is a component of the claimed system. [Doc. No. 149 at 6–10.] *See Finjan,* 626 F.3d at 1204 ("[T]o infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode."). DataQuill argues that it is therefore not required to show that HTC uses or controls the third-

party servers. [*Id.*] DataQuill also argues that it has presented evidence showing that HTC's handsets are capable of updating programs remotely from a processing center, specifically the "Android Market" and the "Windows Marketplace." [*Id.* at 10–13.] In its reply, HTC concedes that DataQuill has raised a genuine dispute of fact with respect to whether the "processing center" limitation of claims 98, 113, and 115 of the '304 Patent are met, and HTC withdraws this portion of its motion. [Doc. No. 163 at 5.] Accordingly, the Court **DENIES** HTC's motion for summary judgment of no direct infringement of claims 98, 113, and 115 of the '304 Patent.

### 3. The "controller" limitation of the '304 Patent

■ HTC argues that it is entitled to summary judgment of no direct infringement of the '304 patent for all of the accused products except for the "Evo 4G." [Doc. No. 133–1 at 11–13.] Specifically, HTC argues that DataQuill has put forth no evidence showing that the accused products other than the "Evo 4G" satisfy the "controller" limitation of the '304 Patent. [*Id.*] In response, DataQuill argues that the testimony of its technical expert Dr. Van der Weide is sufficient to create a triable issue of fact as to whether the accused products satisfy the "controller" limitation. [Doc. No. 149 at 13–18.]

Every asserted claim of the '304 Patent has the limitation of a "controller." [*See* Doc. No. 149–4, *Van der Weide Expert Report* Ex. D.] For each of the asserted claims, Dr. Van der Weide has provided an explanation in his report of how the accused products satisfy the "controller" limitation. [*See id.*] For example, independent claim 80 of the '304 Patent has the limitation "a controller coupled to said reading sensor to receive and process said input." '304 Patent (reexamination certificate) col. 11 l. 38–39. Dr. Van der Weide states that the accused handsets satisfy

this limitation because "HTC devices include a controller; for example, processing circuitry included in on-board chips, coupled to the touchscreen." [Doc. No. 149–4, *Van der Weide Expert Report* Ex. D at 7.] Further, in another part of his report, Dr. Van der Weide states:

> Controller; all accused HTC devices have a controller in the form of processing circuitry in one or more chips or chipsets that function, for example, to process inputs from their touchscreen and access information for display (Block Diagram HTCDQ113869). It is noted that in most devices, the processing circuitry of their controller resides in a MSM or baseband processor chip; in some devices, such as the EVO 4G (code name Supersonic), their controller can also include processing circuitry in an additional chip (e.g. the Atmel AT42QT6022), for example.

[*Id.* at 8.] In addition, exhibit B to the report contains a table where Dr. Van der Weide lists for each of the accused products its corresponding MSM chip. [*See* Doc. No. 149–4, *Van der Weide Expert Report* Ex. B.]

HTC argues that this evidence is insufficient to withstand a motion for summary judgment. [Doc. No. 163 at 3–5.] Specifically, HTC argues that although DataQuill's expert states that in some of the accused devices the controller consists of circuitry in the MSM and circuitry in an additional chip, he never states in his report or his deposition the specific names of the additional chips for any accused products other than the "Evo 4G." [*Id.*] "Although Rule 26(a)(2)(B) requires that experts disclose a 'complete statement of all opinions to be expressed and the basis and reasons therefor' in their expert report, an expert is not required to 'recite each minute fact or piece of scientific information that might be elicited on direct examina-

tion.'" *Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F.Supp.2d 1066, 1075 (S.D.Cal.2007). The deposition testimony cited by HTC shows that DataQuill's expert was willing to provide the specific names of the additional chips, but that he needed certain block diagrams to be able to do so. [*See* Doc. No. 133–15, *Declaration of Phillip Price ("Price Decl.")* Ex. 9 at 238–308.] The transcript does not show that HTC ever gave Dr. Van der Weide the block diagrams and asked him to identify the names of the additional chips. [*See id.*] DataQuill has provided the Court with these block diagrams and a block diagram cited by HTC's technical expert. [See Doc. No. 149–5, *Declaration of Dr. Daniel Van der Weide ("Van der Weide Decl.")* Exs. 2, 4.] In addition, DataQuill has provided a declaration from Dr. Van der Weide providing the names of the accused products where the "controller" requires an additional chip and the names of these additional chips.[2] [Doc. No. 149–3, *Van der Weide Decl.* ¶ 12.] DataQuill has also presented evidence from HTC's technical expert Dr. Lanning listing the names of the chips in the accused devices. [Doc. No. 149–6, *Van der Weide Decl.* Ex. 3.] Therefore, DataQuill has presented sufficient evidence to create a triable issue of fact as to whether the accused products satisfy the "controller" limitation of the '304 Patent. Accordingly, the Court **DENIES** HTC's motion for summary judgment of no direct infringement of the '304

Patent by all of the accused products in addition to the "Evo 4G."

## C. Indirect Infringement

█ HTC argues that it is entitled to summary judgment of no indirect infringement of the '304 Patent and the '591 Patent. [Doc. No. 133–1 at 13–17.] HTC first argues that to the extent DataQuill is unable to establish direct infringement of a claim by HTC, HTC is entitled to summary judgment of no indirect infringement. [*Id.* at 13–14; Doc. No. 163 at 5.] While HTC is correct that a finding of indirect infringement requires a threshold finding of direct infringement by some entity, *see Lucent,* 580 F.3d at 1320, 1322, HTC fails to note that it itself does not have to be found liable for the direct infringement in order for it to be liable for indirect infringement. For example, the threshold act of direct infringement can be performed by a consumer that uses the infringing device. *See, e.g., Anton/Bauer, Inc. v. PAG, Ltd.,* 329 F.3d 1343, 1349 (Fed.Cir.2003). HTC does not argue anywhere in its motion or reply that consumers that use the accused devices are incapable of directly infringing the asserted claims as a matter of law. [*See* Doc. No. 113–1; Doc. No. 163.] Indeed, given that infringement can be proven through circumstantial evidence and DataQuill has produced a substantial number of HTC marketing materials and user guides along with expert testimony, [*see* Doc. No. 145,

2. Although HTC does not formally move to strike the expert declaration, HTC asks that the Court not consider it because it contains additional information not found in his expert report. [Doc. No. 163.] The Court concludes that it may properly consider the declaration. First, it is arguable whether the declaration contains additional information because Dr. Van der Weide's expert report does cite to the block diagrams. [*See* Doc. No. 149–4, *Van der Weide Expert Report* Ex. B.] Second, even assuming the declaration contains additional

information, HTC has not shown that it would be prejudiced by consideration of the declaration because Dr. Van der Weide was willing to provide this information to HTC during its deposition, but HTC chose not to elicit it. [*See* Doc. No. 133–15, *Price Decl.* Ex. 9.] *See Dukes v. Wal–Mart, Inc.,* 222 F.R.D. 189, 195 (N.D.Cal.2004) (denying motion to strike expert testimony for failure to timely disclose the full extent of that testimony where the moving party failed to establish sufficient prejudice).

*Smith Decl.* Exs. 12–16, 21, 23–25, 32; Doc. No. 149–4, *Van der Weide Expert Report* ], HTC would have a difficult time making that argument. *See Lucent*, 580 F.3d at 1318 (stating that a reasonable jury could find that it was "more likely than not one person somewhere in the United States had performed the claimed method" using the accused product where the jury was presented with expert testimony and circumstantial evidence in the form of instruction manuals and documents related to sales of the accused products). Accordingly, HTC is not entitled to summary judgment of no indirect infringement based on its argument that DataQuill has been unable to establish direct infringement by HTC.

### 1. Contributory Infringement

HTC argues that DataQuill cannot establish liability for contributory infringement because all of the accused products have substantial non-infringing uses. [Doc. No. 133–1 at 14–15.] At the hearing, DataQuill stated that it is not pursuing a claim for contributory infringement against HTC. Accordingly, the Court **GRANTS AS MOOT** HTC's motion for summary judgment of no contributory infringement.

### 2. Inducement

■ HTC argues that it is entitled to summary judgment on DataQuill's claim for active inducement of infringement because DataQuill has presented no evidence to support the requirement of specific intent. [Doc. No. 133–1 at 15–17.] A party who "actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Under this provision, the "plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *DSU Med. Corp. v.*

*JMS Co., Ltd.,* 471 F.3d 1293, 1304 (Fed. Cir.2006) (en banc).

■ "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med.,* 471 F.3d at 1306. The Supreme Court recently clarified that induced infringement "requires knowledge that the induced acts constitute patent infringement." *Global–Tech Appliances, Inc. v. SEB S.A.,* —— U.S. ——, 131 S.Ct. 2060, 2068, 179 L.Ed.2d 1167 (2011). However, the Supreme Court explained that under this standard actual knowledge is not required, and that the intent may be shown under the willful blindness doctrine. *Id.* at 2068–70. Under this doctrine, the defendant must (1) believe subjectively that there is a high probability that a fact exists, and (2) take deliberate actions to avoid learning of that fact. *Id.* at 2070–71. A plaintiff may prove the intent element of inducement through circumstantial evidence. *Lucent,* 580 F.3d at 1322. "Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner." *Id.*

■ DataQuill contends that HTC began selling infringing products in September 2008. [Doc. No. 151 at 1; *see also* Doc. No. 135–2, *Gemini Expert Report* at 6 ¶ 19.] Further, the parties agree that due to the reexamination of the two patents, the asserted claims of the '304 Patent that survived reexamination have an effective date of May 2, 2000 while the remaining asserted claims of the '304 Patent that were added during reexamination have an effective date of April 13, 2010 and all of the asserted claims of the '591 Patent were added during reexamination and have an effective date of October 27, 2009.

[Doc. No. 130–1 at 2–3; Doc. No. at 3.] Therefore, the relevant dates for when the infringement—direct or indirect—allegedly began are September 2008, October 27, 2009, and April 13, 2010.

To support its allegations of inducement, DataQuill presented a letter dated January 26, 2006 that it sent to HTC notifying it of the '304 Patent and a letter dated February 15, 2007 notifying HTC of the '591 Patent. [Doc. No. 145, *Smith Decl.* Ex. 30 at 1251–52.] In addition, DataQuill filed the present lawsuit accusing HTC of infringing the '304 Patent and the '591 Patent on March 24, 2008. [*Compl.*] After this action was commenced, a reexamination certificate for the '591 Patent was issued on October 27, 2009 and a reexamination certificate for the '304 Patent was issued on April 13, 2010. *See* '304 Patent (reexamination certificate); '591 Patent (reexamination certificate). [*See also* Doc. Nos. 38, 42.] DataQuill has also produced an expert report explaining how the accused products infringe the two patents, [Doc. No. 149–4, *Van der Weide Expert Report* ], and DataQuill has produced a substantial number of HTC marketing materials and user guides related to the accused products. [Doc. No. 145, *Smith Decl.* Exs. 12–16, 21, 23–25, 32.] Based upon this evidence and drawing all reasonable inferences in favor of DataQuill, a reasonable jury could conclude that in September 2008, HTC knew that its products infringed the '304 Patent and that its marketing materials and user guides encouraged users of the accused products to infringe the '304 Patent. *See Lucent,* 580 F.3d at 1322–23 (upholding jury finding of inducement). A reasonable jury could also conclude that on October 17, 2009 and April 13, 2010, respectively, HTC knew its products infringed the new claims of the '591 Patent and the '304 Patent and that its marketing materials and user guides encouraged users of the accused products

to infringe these claims that were added during reexamination. *See id.*

In response to the evidence presented by DataQuill, HTC makes two arguments. First, HTC argues that the evidence presented by DataQuill is insufficient to satisfy the intent requirement because DataQuill has only produced evidence related to the issue of whether HTC had knowledge of the allegedly induced acts. [Doc. No. 163 at 6.] HTC argues that DataQuill has presented no evidence related to the issue of whether HTC knew these acts infringed. [*Id.*] HTC is incorrect. DataQuill has presented evidence that prior to any alleged infringement by HTC, HTC not only had knowledge of the patents-in-suit, it had knowledge of DataQuill's contention that HTC was infringing these patents because DataQuill had already filed the present lawsuit against HTC. [*See* Doc. No. 145, *Smith Decl.* Ex. 30 at 1251–52; *Compl.*; Doc. Nos. 38, 42.] This evidence bears on the issue of whether HTC knew the allegedly induced acts infringed the asserted claims of the '304 Patent and the '591 Patent. *See Global–Tech,* 131 S.Ct. at 2068 (stating that "knowledge of the existence of the patent that is infringed" is needed for induced infringement); *DSU,* 471 F.3d at 1305. Therefore, based on this evidence, a reasonable jury could find that HTC not only knew of the acts that it was allegedly inducing, but that it also knew that these acts constituted infringement.

HTC's second argument is that the undisputed facts show that it did not have the specific intent to induce infringement. [Doc. No. 133 at 15–17.] In support of its argument, HTC relies on the fact that the USPTO rejected all the claims of both the patents-in-suit in April 2008 in non-final office actions. [*Id.* at 15.] HTC also relies on its contention that it has asserted substantial defenses to DataQuill's claims throughout this litigation. [*Id.* at 16.]

This evidence at best shows that there is a triable issue of fact as to whether HTC is liable for induced infringement. HTC cites to no case law standing for the proposition that inducement can be foreclosed as a matter of law by rejections in a non-final office action or by the assertion of substantial defenses during litigation of the patents-in-suit.

In support of its argument, HTC cites to *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293 (Fed.Cir.2006), *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335 (Fed.Cir.2009), and *Goss Int'l Ams., Inc. v. Graphic Mgmt. Assocs.*, 739 F.Supp.2d 1089 (N.D.Ill.2010). However, *DSU* and *Ecolab* are cases dealing with post-trial motions where the Federal Circuit found that there was substantial evidence to support the jury's findings of no inducement; not cases where the court found inducement foreclosed as a matter of law. *See DSU*, 471 F.3d at 1307; *Ecolab*, 569 F.3d at 1351. Further, in Goss the district court did grant summary judgment of no inducement, but *Goss* is distinguishable from the present case. The determination in *Goss* was based on a pre-litigation opinion letter that defendants obtained from their patent counsel that the district court found to be competent. *See Goss*, 739 F.Supp.2d at 1114–17, 1125–26. HTC has not presented any evidence showing that it obtained a competent opinion letter stating that it did not infringe the '304 Patent or the '591 Patent prior to the filing of this lawsuit. HTC has only presented the opinions and arguments of its trial counsel post-filing. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 2011 U.S. Dist. LEXIS 91693, at *39 (E.D.Tex. Aug. 17, 2011) (finding that an opinion letter obtained a year after the lawsuit commenced had "no real probative value" for the defendant's defense to the plaintiff's inducement allegations); *see also In re Seagate Tech., LLC*, 497 F.3d 1360, 1372 (Fed.Cir. 2007) (en banc) ("communications of trial counsel have little, if any, relevance"). Ac-

cordingly, the Court **DENIES** HTC's motion for summary judgment of no infringement by inducement.

### D. Conclusion

In conclusion, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for partial summary judgment of noninfringement.

## II. Motion for Summary Judgment of No Willful Infringement

HTC moves for summary judgment of no willful infringement. [Doc. No. 130–1.] First, HTC argues that DataQuill's claim for willful infringement is barred as a matter of law because DataQuill's claim for willful infringement is only based on HTC's post-filing conduct and DataQuill did not seek a preliminary injunction in this case. [*Id.* at 5–8.] Second, DataQuill argues that no reasonable jury could find that HTC has acted recklessly with respect to the patents-in-suit. [*Id.* at 8–9.]

### A. Legal Standard for a Motion for Summary Judgment

*See supra* section I.A.

### B. Legal Standard for Willful Infringement

■■■ To establish willful infringement, a patentee must make a "showing of objective recklessness." *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed.Cir. 2007) (en banc).

Accordingly, to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk

(determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer. *Id.* (citations omitted). Whether infringement is willful is a question of fact and is determined based on the totality of the circumstances. *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311–12 (Fed.Cir.2007).

## C. Failure to Obtain an Injunction as a Bar to Willful Infringement

 DataQuill alleges that HTC first began infringing the patents-in-suit in September 2008, a few months after DataQuill filed the present lawsuit. [Doc. No. 151 at 1.] At no time during this litigation has DataQuill moved for a preliminary injunction against HTC to stop the allegedly infringing activities from occurring. HTC argues that because DataQuill is only seeking damages for post-filing conduct and DataQuill has not sought a preliminary injunction in this case, DataQuill's claim for willful infringement is barred as a matter of law. [Doc. No. 130–1 at 5–8.] In making this argument, DataQuill relies on the following language from the Federal Circuit's *en banc* decision in *Seagate:*

> [W]hen an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction, which generally provides an adequate remedy for combating post-filing willful infringement. A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to

accrue enhanced damages based solely on the infringer's post-filing conduct. Similarly, if a patentee attempts to secure injunctive relief but fails, it is likely the infringement did not rise to the level of recklessness.

> We fully recognize that an accused infringer may avoid a preliminary injunction by showing only a substantial question as to invalidity, as opposed to the higher clear and convincing standard required to prevail on the merits. However, this lessened showing simply accords with the requirement that recklessness must be shown to recover enhanced damages. A substantial question about invalidity or infringement is likely sufficient not only to avoid a preliminary injunction, but also a charge of willfulness based on post-filing conduct.

*Seagate,* 497 F.3d at 1374 (citations omitted).

In its motion for summary judgment, HTC argues that the above language from *Seagate* creates a *per se* bar to any claim for willful infringement based on post-filing conduct where the patentee did not seek a preliminary injunction. [Doc. No. 130–1 at 5–6.] Although district courts have found that *Seagate* can create a bar to claims for post-filing willful infringement where an injunction was not sought, all the courts that have addressed the issue have found that bar is not absolute. *See Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, 759 F.Supp.2d 387, 412 & n. 174 (S.D.N.Y.2010) (listing cases).[3]

---

**3.** *See also Webmap Techs., LLC v. Google, Inc.,* 2010 WL 3768097, at *2–3, 2010 U.S. Dist. LEXIS 104137, at *9–10 (E.D.Tex. Sept. 20, 2010); *Netscape Communs. Corp. v. Valueclick, Inc.,* 684 F.Supp.2d 699, 728 (E.D.Va. 2010); *Affinity Labs of Tex., LLC v. Alpine Elecs. of Am., Inc.,* 2009 U.S. Dist. LEXIS 130147, at *10 (E.D.Tex. Sept. 2, 2009); *St. Clair Intellectual Prop. Consultants v. Palm, Inc.,* 2009 WL 1649751, at *1, 2009 U.S. Dist. LEXIS 49922, at *4 (D.Del. Jun. 10, 2009);

*Krippelz v. Ford Motor Co.,* 670 F.Supp.2d 806, 812 (N.D.Ill.2009); *Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.,* 2009 WL 483865, at *3, 2009 U.S. Dist. LEXIS 14632, at *8 (D.N.J. Feb. 25, 2009); *Anascape, Ltd. v. Microsoft Corp.,* 2008 WL 7182476, at *3–4, 2008 U.S. Dist. LEXIS 111828, at *12 (E.D.Tex. Apr. 25, 2008) *rev'd on other grounds by Anascape, Ltd. v. Nintendo of Am., Inc.,* 601 F.3d 1333 (Fed.Cir.2010).

Further, at the hearing on these motions, HTC conceded that *Seagate* did not create a *per se* bar to claims for post-filing willful infringement where an injunction was not sought. Because *Seagate* did not create a *per se* bar, the determination of whether a patentee may pursue a claim for willful infringement based on post-filing conduct without seeking a preliminary injunction "will depend on the facts of each case." *Seagate,* 497 F.3d at 1374; *see also e.g., Netscape,* 684 F.Supp.2d at 728 (stating that failure to seek a preliminary injunction is relevant to but not dispositive of the willfulness determination); *Inv. Tech. Group,* 759 F.Supp.2d at 412 (stating that "there are limited circumstances under which a patentee may sustain a claim of post-filing willful infringement despite the patentee's failure to first seek a preliminary injunction"); *Webmap Techs.,* 2010 WL 3768097, at *3, 2010 U.S. Dist. LEXIS 104137, at *9–10 (stating that "certain extenuating circumstances may exist to allow a plaintiff to sustain a claim of post-filing willful infringement despite the plaintiff's failure to first seek a preliminary injunction").

DataQuill argues that it was not required to obtain a preliminary injunction in this case because the Court likely would have denied it injunctive relief since it does not practice the patents-in-suit, is not a competitor of HTC, and has a history of licensing its patents. [Doc. No. 151 at 11–12.] Several district courts have recognized that a patentee who neither practices its invention nor directly competes with the accused infringer is excused from *Seagate's* rule that a patentee must seek an injunction to sustain a claim for post-filing willful infringement. *See Inv. Tech. Group,* 759 F.Supp.2d at 412; *Krippelz,* 670 F.Supp.2d at 812; *Affinity Labs,* 2009 U.S. Dist. LEXIS 130147, at *10–11 & n. 3. The district court in *Krippelz* explained the reasoning for this exception:

> The pursuit of preliminary injunction may fail for reasons other than its lack of merit on the underlying claim. Even a strong claim for injunctive relief will ordinarily fail when an inventor, who does not practice the invention and does not compete with the infringer, sues for injunction. It is a general rule of equity that injunctions should not issue where money damages will suffice because irreparable injury cannot be shown. This principle is applicable to patent injunctions. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). I can envision a rare case where an inventor, while not in direct competition with an infringer, could secure a preliminary injunction if the inventor is entitled to a preliminary injunction, had well-formed plans to compete against the infringer and demonstrated, for example, that the infringer was effectively locking up, for a period of years, a substantial share of customers for the patented device. There is no flavor of that in this case. *Krippelz* could not have gotten an injunction in this case, and, while only I know that for a certainty,

In support of its proposition that there is a *per se* bar, HTC cites to *Creative Compounds, LLC v. Starmark Labs., Inc.,* 2010 WL 2757196, at *4, 2010 U.S. Dist. LEXIS 69795, at *12 n. 19 (S.D.Fla. Jul. 13, 2010); *Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.,* 2010 WL 668039, at *18–19, 2010 U.S. Dist. LEXIS 21778, at *49–50 (N.D.Cal. Feb. 19, 2010); and *GSI Group, Inc. v. Sukup Mfg. Co.,* 591 F.Supp.2d 977, 984–85 (C.D.Ill.

2008). However, these are merely cases where the *Seagate* bar was applied to the patentee's willfulness claims for post-filing conduct, but none of these cases specifically held that the *Seagate* bar is absolute and is not subject to any exceptions. *See id.* Indeed, none of these cases even addressed the issue of whether the Seagate bar is absolute. *See id.*

Krippelz could reasonably and wisely conclude that he would not win; that it would be a waste of time and resources, his own and the court's, to make the effort.

*Krippelz,* 670 F.Supp.2d at 812–13; *see also Affinity Labs,* 2009 U.S. Dist. LEXIS 130147, at *11 ("There is little difference between the situation where the court denies a preliminary injunction and that where counsel believes a motion for a preliminary injunction would be inappropriate and opts instead not to file one after considering his or her ethical obligations under Fed.R.Civ.P. 11. The *Seagate* court explicitly declined to apply a *per se* rule in the first situation, and the court sees no reason why a different result is mandated in the latter situation."). The Court agrees with the reasoning of the district courts in *Krippelz* and *Affinity Labs.* Therefore, the *Seagate* bar should not apply to DataQuill in this case because the Court agrees with DataQuill's assertion; based on the facts in this case, DataQuill would not have been able to obtain a preliminary injunction because it does not practice the patents-in-suit and it does not compete with HTC.

Although HTC admitted at the hearing that DataQuill would have a difficult time obtaining a preliminary injunction in this case, HTC argues that it still should have been required to seek one. HTC makes several arguments in support of its position. First, HTC argues that some district courts have rejected the argument that a patentee should should not be required to seek a preliminary injunction because it probably would have been denied one. [Doc. No. 157 at 5–6.] *See Webmap Techs.,* 2010 WL 3768097, 2010 U.S. Dist. LEXIS 104137, at *10–12; *Anascape,* 2008 WL 7182476, at *3, 2008 U.S. Dist. LEXIS 111828, at *11–12 ("A party should not waive its rights, and the court cannot make its findings, based on a possible ruling in a hypothetical situation."). However, the

Court does not find either *Webmap Techs.* or *Anascape* to be persuasive authority. The district court did not discuss whether the patentee was a non-practicing entity or a non-competitor of the accused infringer in either case. *See id.* Therefore, it is not clear that those cases, like the present case, involved a patentee that clearly would have been denied a preliminary injunction had it sought one.

Next, HTC notes that in some cases, it is possible for a non-practicing entity to be able to obtain an injunction. [Doc. No. 157 at 5.] *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *see, e.g., Commonwealth Sci. & Indus. Research Org. v. Buffalo, Inc.,* 492 F.Supp.2d 600, 604 (E.D.Tex.2007) (granting permanent injunction in favor of a non-competitor/non-practicing entity). However, this is of little consequence. The Court recognizes that in some cases a non-practicing entity might be entitled to a preliminary injunction, *see id.,* and in those cases the *Seagate* bar might apply if a preliminary injunction is not sought. But, in the present case, it is clear to the Court that DataQuill would have been denied a preliminary injunction had it sought one. *See Krippelz,* 670 F.Supp.2d at 812–13 (noting that in some cases a non-practicing entity can obtain a preliminary injunction, but finding "no flavor of that in [the present] case").

Finally, HTC relies on the Federal Circuit's language in *Seagate.* HTC argues that in *Seagate,* the Federal Circuit recognized that "in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits, such as when the remaining factors are considered and balanced. *In that event,* whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case." *Seagate,* 497 F.3d at 1374

(emphasis added). HTC argues that this language implies that even though a patentee might think that he will be denied a preliminary injunction, the patentee should still request the injunction, and only after the Court denies the injunction, should the Court determine whether the patentee may proceed on its willfulness claims. However, the Court declines to read *Seagate* in such a narrow manner as to require all patentees seeking claims for post-filing willful infringement to file motions for preliminary injunctions in every situation no matter how frivolous they may be. The district court in *Krippelz* correctly noted that this "would be a waste of time and resources, [the patentee's] and the court's." *Krippelz*, 670 F.Supp.2d at 813. Accordingly, DataQuill's claim for willful infringement is not barred as a matter of law because it did not seek a preliminary injunction in this case.[4]

### D. Whether a Reasonable Jury Could Find That HTC Acted Recklessly

■ HTC also argues that it is entitled to summary judgment because even if DataQuill's willful infringement claims are not barred as a matter of law by *Seagate*, no reasonable jury could find that HTC acted recklessly with respect to the patents-in-suit. [Doc. No. 130–1 at 8–9.] First, HTC argues that it cannot be found to have acted recklessly because during the reexamination proceedings all of the claims of both of the patents-in-suit were rejected in non-final office actions. [*Id.* at 8.] However, HTC's argument appear to be foreclos-

ed by Federal Circuit precedent. In *Hoechst Celanese Corp. v. BP Chems. Ltd.*, the Federal Circuit stated:

> We take notice that the grant by the examiner of a request for reexamination is not probative of unpatentability. The grant of a request for reexamination, although surely evidence that the criterion for reexamination has been met (i.e., that a "substantial new question of patentability" has been raised, 35 U.S.C. § 303), does not establish a likelihood of patent invalidity. *See Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 [ (Fed.Cir.1991) ] ("initial rejection by the Patent and Trademark Office of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the claims") . . . .

78 F.3d 1575, 1584 (Fed.Cir.1996) (footnote omitted). The Federal Circuit then rejected the defendant's contention that the grant of reexamination "supports the position that infringement was not willful." *Id.*; *see also Krippelz v. Ford Motor Co.*, 675 F.Supp.2d 881, 894 (N.D.Ill.2009) ("*Hoechst Celanese* holds that the grant of a reexamination and interim PTO rejections are not probative (i.e. not relevant, and therefore not admissible) evidence on the question of patentability.").

HTC argues that *Hoechst Celanese* is distinguishable from the present case because it was a case where reexamination proceedings were only initiated and not where claims were rejected during the

---

4. District courts have also recognized that a patent surviving reexamination constitutes an "extenuating circumstance" excusing *Seagate*'s requirement of seeking a preliminary injunction. *See St. Clair*, 2009 WL 1649751, at *1, 2009 U.S. Dist. LEXIS 49922, at *4 (establishing exception); *Inv. Tech. Group*, 759 F.Supp.2d at 412 (recognizing exception); *Webmap Techs.*, 2010 WL 3768097, at *2–3, *4, 2010 U.S. Dist. LEXIS 104137, at *9–10, *13 (recognizing exception). This exception

likely applies to the asserted claims of the '304 Patent that exited the reexamination proceedings without amendment, specifically claims 83, 86, 101, 113, and 115. However, because the Court has already determined that the *Seagate* bar does not apply to DataQuill because it would not have been able to obtain a preliminary injunction, the Court need not engage in further analysis of this additional exception.

proceedings. [Doc. No. 157 at 3.] While this is true, it fails to recognize that the Court in *Hoechst Celanese* relied on *Acoustical Design, Inc. v. Control Elecs. Co.*, a case where the claims were rejected during the reexamination proceedings. *See Acoustical Design*, 932 F.2d at 942. Further, courts have held that because PTO interim rejections are not binding, they are generally not relevant to issue of invalidity. *See Sigram Schindler Beteiligungsgesellschaft mbH v. Cisco Sys.*, 726 F.Supp.2d 396, 415 & n. 31 (D.Del.2010); *Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F.Supp.2d 780, 793–94 (S.D.Tex.2010); *see also Krippelz*, 675 F.Supp.2d at 894 ("Interim rejections are the norm at the PTO."). HTC also argues that *Hoechst Celanese* is distinguishable because in that case the alleged infringement occurred prior to the initiation of the reexamination proceedings unlike in the present case. However, the Court does not see why this distinction is meaningful. In *Hoechst Celanese*, the Federal Circuit clearly stated that the grant of a request for reexamination is not probative of unpatentability. 78 F.3d at 1584. The Federal Circuit did not hold that the grant of a request for reexamination is not probative of unpatentability only if the reexamination proceedings are commenced after the alleged infringement has begun.

The Court also does not find the district court cases relied on by HTC persuasive. The holding in *Lucent Techs., Inc. v. Gateway, Inc.*, 2007 WL 6955272, at \*6–7, 2007 U.S. Dist. LEXIS 95934, at \*17–19 (S.D.Cal. Oct. 30, 2007) that the mere granting of a request for reexamination forecloses as a matter of law a finding of willful infringement based on post-filing conduct is directly contradicted by *Hoechst Celanese*. Further, the holding was based on the erroneous conclusion that the USPTO's "substantial new question of patentability" standard used for granting reexamination requests is the same as the "substantial question of validity" standard used for granting preliminary injunctions. The Federal Circuit has held that these are two different standards and that the former is less stringent than the latter. *P & G v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed.Cir.2008). Moreover, *Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F.Supp.2d 780, 818 (S.D.Tex. 2010) is self-contradicting. In *Tesco*, the district court held that an interim rejection during reexamination proceedings is not probative of patentability. *Id.* at 794. However, later the *Tesco* court stated that "the fact that the examiners rejected the claims demonstrates that a major issue exists as to whether they are valid." *Id.* at 818. The Court agrees with *Tesco's* first conclusion rather than the second. An interim rejection is not probative of patentability, and therefore, an interim rejection does not foreclose as a matter of law a jury from finding that HTC acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. Accordingly, the Court rejects HTC's argument that the interim rejections by the PTO during the reexamination proceedings foreclose a finding of willful infringement as a matter of law.

■ HTC also argues that no reasonable jury could find that it acted recklessly because its pleadings, discovery responses, invalidity contentions, and its motion for partial summary judgment of non-infringement show that HTC has asserted in good faith numerous credible defenses. [Doc. No. 130–1 at 9.] "[B]oth legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed.Appx. 284, 291 (Fed.Cir.2008); *see, e.g., Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d

1351, 1374 & n. 4 (Fed.Cir.2008) (finding that a sufficiently close question of proper claim construction foreclosed a finding of willfulness).

However, HTC has not shown at this point that it has legitimate defenses to infringement and credible invalidity arguments. HTC has not moved for summary judgment on the issue of invalidity. HTC also has not explained why its preliminary invalidity contentions are credible, particularly in light of the fact that some of the claims survived reexamination proceedings. *See Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 961 (Fed.Cir.1986) (stating that when a claim survives reexamination proceedings, an accused infringer's burden of proving invalidity is " 'made heavier' "). In addition, the Court has denied the majority of HTC's motion for partial summary judgment of non-infringement. *See supra* section I. Although part of the motion was granted, this is of no consequence because this only shows that HTC had legitimate defenses with respect to those particular infringement allegations. It does not show that HTC has legitimate defenses to the remaining infringement allegations that will survive summary judgment or the allegations for which HTC did not move for summary judgment. Accordingly, HTC has not shown that it is entitled to summary judgment of no willful infringement.

### E. Conclusion

In conclusion, the Court **DENIES** HTC's motion for summary judgment of no willful infringement.

### III. Motion to Exclude the Expert Opinions of Joseph Gemini

HTC moves to exclude the expert opinions of DataQuill's damages expert, Joseph Gemini. [Doc. No. 135.] HTC argues that Mr. Gemini's testimony is unreliable for three reasons. [*Id.* at 1.] First, HTC argues that Mr. Gemini improperly inflates his royalty calculation by relying on HTC licenses that are not comparable to the hypothetical agreement at issue in this case. [*Id.*] Second, HTC argues that Mr. Gemini applies enhanced royalty rates for certain groups of claims without any factual support. [*Id.*] Third, HTC argues that Mr. Gemini uses the total revenue of the accused products as his royalty base in violation of the entire market value rule. [*Id.*]

### A. Legal Standard for a Motion to Exclude Expert Testimony

A district court's decision to admit expert testimony under *Daubert* follows the law of the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed.Cir.2003). When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under Rule 702 of the Federal Rules of Evidence, a court may permit opinion testimony from an expert only if such testimony "will assist the trier of fact" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010); (citing

*Daubert*, 509 U.S. at 594, 596, 113 S.Ct. 2786). "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* (quoting *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

## B. Legal Standard for Calculating Patent Damages

██ "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Two alternative methods exist for calculating damages in a patent case; they "are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." *Lucent*, 580 F.3d at 1324. DataQuill does not appear to contend that it is entitled to lost profits. [*See generally* Doc. No. 135–2, *Gemini Expert Report*; Doc. No. 150.] Accordingly, damages is this case should be calculated by determining the reasonable royalty DataQuill would have received through arms-length negotiation. *See Lucent*, 580 F.3d at 1324.

██ To calculate the reasonable royalty, patentees generally consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent*, 580 F.3d at 1324–25; *see also Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n. 13 (Fed.Cir. 1995) (en banc). This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." *Lucent*, 580 F.3d at 1325. In determining the reasonable royalty that would been agreed to at the hypothetical negotiation, parties in patent cases frequently utilize the fifteen factors enunciated in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970). The Federal Circuit has expressly "sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed.Cir.2011).

██ A hypothetical negotiation can result in either a lump-sum license or a running royalty license. *See Lucent*, 580 F.3d at 1326. A lump-sum license is an up-front payment in full for the invention that involves uncertainty about "whether the technology is commercially successful or even used." *Id.* In contrast, a running royalty license is directly tied to how often the invention is incorporated into products by the licensee and is calculated by multiplying the proposed royalty rate by the proposed royalty base. *See id.*, 580 F.3d at 1326, 1338–39.

██ "The burden of proving damages falls on the patentee." *Lucent*, 580 F.3d at 1324. To properly carry this burden, the patentee must sufficiently tie the expert testimony on damages to the facts of the case. *Uniloc*, 632 F.3d at 1315 (citing *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786).

## C. Mr. Gemini's Damages Analysis

DataQuill's damages expert Mr. Gemini's analysis begins by giving a general overview of the two patents-in-suit and the accused products that allegedly infringe these two patents. [Doc. No. 135–2, *Gemini Expert Report* at 4–7.] Mr. Gemini then considers the revenue realized from the accused products, the demand for the patented technology in the accused products—specifically the demand for the An-

droid Market and Windows Marketplace, the demand for camera phone capabilities, and the demand for web browsing—, and both the licensing of the patents-in-suit and licenses entered into by HTC. [*Id.* at 9–30.] Mr. Gemini then takes this information and analyzes the fifteen *Georgia–Pacific* factors to determine the reasonable royalty the parties would have agreed to during the hypothetical negotiation. [*Id.* at 30–37.]

Mr. Gemini concludes that the parties during the hypothetical negotiation would have agreed to a running royalty license. [Doc. No. 135–2, *Gemini Expert Report* at 36.] Specifically, Mr. Gemini opines that in the event HTC is found liable for infringement of all of the patents-in-suit, the royalty rate owed would be 1.00% during the period of September 10, 2008 through October 26, 2009, 1.10% during the period of October 27, 2009 through April 12, 2010, and 1.60% for the period of April 13, 2010 going forward.[5] [*Id.*] Mr. Gemini then applies these royalty rates to the royalty base of $7.58 billion, which represents the total revenue of the accused products, and concludes that the reasonable royalty owed to DataQuill would be $108.7 million. [*Id.*]

### D. License Comparability

■ HTC argues that Mr. Gemini's analysis is unreliable because Mr. Gemini's royalty rates are improperly inflated due to his reliance on HTC licenses to patents that are not comparable to the patents-in-

suit.[6] [Doc. No. 135 at 7–13.] In response, DataQuill argues that Mr. Gemini has provided a sufficient factual basis to support his decision to rely on these HTC licenses. [Doc. No. 150 at 9–19.]

■ "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc,* 632 F.3d at 1317. Therefore, "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent,* 580 F.3d at 1325. A patentee may not rely on license agreements that are " 'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Uniloc,* 632 F.3d at 1316 (quoting *Lucent,* 580 F.3d at 1328); *see also Wordtech Sys. v. Integrated Networks Solutions, Inc.,* 609 F.3d 1308, 1320 (Fed.Cir.2010) (declining to find licenses comparable because they "arose from divergent circumstances and covered different material"); *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 870 (Fed.Cir. 2010) (criticizing damages expert for relying on licenses that showed no "discernible link to the claimed technology"). Further, "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." *Wordtech,* 609 F.3d at 1320 (quoting *ResQNet,* 594 F.3d at 873); *see also Finjan,* 626 F.3d at 1211 ("[U]se of past patent licenses under factors 1 and 2 must

---

5. These three different time periods represent the fact that only the original claims of the '304 Patent that survived reexamination could have been infringed on September 10, 2008, the claims of the '591 Patent that were added during reexamination could not have been infringed until October 27, 2009, and the claims of the '304 Patent that were added during reexamination could not have been infringed until April 12, 2010, due to the effective dates of the respective claims. [Doc. No. 135–2, *Gemini Expert Report* at 4–5.]

6. In its motion to exclude, HTC also criticizes Mr. Gemini for placing no weight on DataQuill's prior licensing of the patents-in-suit in his analysis of the *Georgia–Pacific* factors, specifically factor 1. [Doc. No. 135 at 7.] However, in its reply brief, HTC clarifies that it is not moving to exclude Mr. Gemini's expert opinions on this ground. [Doc. No. 167 at 1.]

account for differences in the technologies and economic circumstances of the contracting parties."). The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded. *See, e.g., IP Innovation L.L.C. v. Red Hat, Inc.,* 705 F.Supp.2d 687, 690–91 (E.D.Tex.2010) (Rader, J.).

In conducting his analysis, Mr. Gemini relies on a number of patent license agreements that HTC has entered into that he refers to as "significant patent agreements." [Doc. No. 135–2, *Gemini Expert Report* at 21–29.] Mr. Gemini states that these "significant patent agreements" are comparable to a license that would have been negotiated for the patents-in-suit. [*Id.* at 22.] Mr. Gemini explains his basis for believing that the licenses are comparable as follows:

> The patented technology licensed under these significant patent agreements provide technology concerning the ability to provide a mobile delivery system, for example the 3G network. The DataQuill patents concern the smartphones that use and exploit the capability of these delivery systems, such as, Android Market and Web browsing. The two technologies are coupled as you need the high speed delivery system in order to take advantage of the advanced smartphone capabilities as provided by the DataQuill patents advanced capabilities that utilize the system.

[*Id.*]

Turning to HTC's specific criticisms of Mr. Gemini's reliance on these licenses, HTC first argues that Mr. Gemini has not provided any evidence that the patents in the "significant patent agreements" are technologically comparable to the patents-in-suit. [Doc. No. 135 at 8.] In *Lucent,* the Federal Circuit found that the jury's award of patent damages could not be supported by license agreements where

the patentee's expert "supplied no explanation ... about the subject matter or patents covered by those agreements." 580 F.3d at 1328. However, HTC is incorrect that Mr. Gemini has not provided any evidence at all of technological comparability. The passage quoted above from Mr. Gemini's expert report shows the factual basis for his contention that the licenses are comparable. The licenses involve mobile delivery system technology and the patents-in-suit relate to technology that exploits those delivery systems. [Doc. No. 135–2, *Gemini Expert Report* at 22.] Mr. Gemini further explains that the two technologies are coupled as they are both are necessary to take advantage of advanced smart phone capabilities. [*Id.*] Therefore, Mr. Gemini has provided a factual basis and an explanation for his contention that the licenses are technologically comparable.

HTC argues that Mr. Gemini cannot conclude that the technologies are comparable because he does not know what technology is covered by the "significant patent agreements." [Doc. No. 135 at 9.] HTC points to deposition testimony where Mr. Gemini admits that he did not review every patent licensed in the "significant patent agreements." [*Id.*] However, HTC does not explain why review of each and every patent is necessary to know what technology the licenses relate to in general. In his report, not only does Mr. Gemini state that these licenses relate to "mobile delivery system" technology; for each agreement, Mr. Gemini states the specific mobile technology to which the agreement relates. [See Doc. No. 135–2, *Gemini Expert Report* at 24–27.] For example for the December 20, 2000 license HTC obtained from Qualcomm, Mr. Gemini states that the technology in this license relates to "CDMA cellular communications." [*Id.* at 24.] HTC does not appear to refute that these licenses are indeed related to

the technology specified by Mr. Gemini. Accordingly, Mr. Gemini has supplied a sufficient explanation of the technology covered by the agreements.

HTC argues that technology related to mobile delivery systems is not comparable to technology that exploits or takes advantage of those systems. [Doc. No. 135 at 9–10.] While there may be some differences between the two technologies, Mr. Gemini explains in his report that based on his review of the materials cited in his report, the two technologies are of similar importance to the accused devices overall. [*See* Doc. No. 135-2, *Gemini Expert Report* at 22–24, 29.] Therefore, Mr. Gemini has provided a factual basis and an explanation for his conclusion that the technology in the "significant patent agreements" is comparable to the technology in the patents-in-suit, and Mr. Gemini has provided a "discernable link" to the claimed technology. *See ResQNet,* 594 F.3d at 870; *Synthes USA, LLC v. Spinal Kinetics, Inc.,* 2011 U.S. Dist. LEXIS 93093, at *29–30 (N.D.Cal. Aug. 19, 2011); *Saffran v. Johnson & Johnson,* 2011 U.S. Dist. LEXIS 34858, at *32–36 (E.D.Tex. Mar. 31, 2011). However, the Court's analysis does not end here.

Although the Court finds that Mr. Gemini has sufficient factual support for his conclusion that the "significant patent agreements" are technological comparable to the license reached at the hypothetical negotiation, Mr. Gemini does not appear to have sufficient factual support for his conclusion that they are economically comparable. In considering licenses, a damages expert must account for not only technological differences but economic differences as well. *See Wordtech,* 609 F.3d at 1320; *Finjan,* 626 F.3d at 1211. However, Mr. Gemini's report appears to have no analysis at all of the economic differences between the "significant patent agreements" and the license reached at the

hypothetical negotiation. Therefore, Mr. Gemini has failed to establish economic comparability and his testimony regarding the "significant patent agreements" should be excluded on this ground alone. *See, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.,* 2011 WL 7563818, at *2–4, 2011 U.S. Dist. LEXIS 42590, at *9–11 (E.D.Tex. Jan. 7, 2011); *IP Innovation,* 705 F.Supp.2d at 691.

██ Moreover, what is troubling about Mr. Gemini's lack of economic analysis is that "the significant patent agreements" appear to be licenses between HTC and heavyweights in the telecommunications industry such as Qualcomm, Ericson, Nokia, Lucent and Motorola for entire portfolios of patents. [*See* Doc. No. 135-1, *Declaration of William Hicks* ("*Hicks Decl.*") Exs. 15–23.] For example, HTC has shown the Court that one of the "significant patent agreements" is a worldwide license between HTC and Motorola for hundreds of patents covering a broad range of inventions. [*See id.* Ex. 19; Doc. No. 167 at 2.] The Motorola license appears to be "radically different from the hypothetical agreement under consideration," which in this case is a domestic license for two patents. *Lucent,* 580 F.3d at 1328; *see also id.* ("[A] reasonable juror could only conclude that the IBM–Dell license agreement for multiple patents to broad, PC-related technologies is directed to a vastly different situation than the hypothetical licensing scenario of the present case involving only one patent, the Day patent, directed to a narrower method of using a graphical user interface tool known as the date-picker."). "[W]here a license covers a portfolio of patents or includes other intellectual property or services, Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services

covered by the license agreement." *LaserDynamics*, 2011 WL 7563818, at *3, 2011 U.S. Dist. LEXIS 42590, at *11. "It is not sufficient to state that both patents cover [similar] technology." *Id.* As stated in the previous paragraph, Mr. Gemini has only stated that the "significant patent agreements" and the license at issue in this case cover similar technology; he has not presented sufficient evidence to allow the jury to weigh the economic differences between the licenses.

At the hearing, DataQuill argued that it is difficult for Mr. Gemini analyze the economic comparability of the "significant patent agreements" to the license at issue in this case because it is difficult to decipher what is actually covered by the "significant patent agreements." However, Mr. Gemini bears the burden of proving comparability if he wants to rely on the "significant patent agreements" in performing his reasonable royalty analysis. *See LaserDynamics*, 2011 WL 7563818, at *3, 2011 U.S. Dist. LEXIS 42590, at *10–11 ("Plaintiff must establish comparability of the licenses before integrating their royalty rates into Mr. Murtha's analysis in front of the jury."); *IP Innovation*, 705 F.Supp.2d at 691. If Mr. Gemini cannot show that the "significant patent agreements" are economically comparable, then he should not rely on those licenses in his analysis. *See id.*

In addition, the Court rejects DataQuill assertion that Mr. Gemini did account for the economic differences between the "significant patent agreements" and the license at issue in the hypothetical negotiation simply because he picked a low royalty rate. DataQuill points out that Mr. Gemini calculated a reasonable royalty for the patents-in-suit between 1.0% and 1.6%, but the royalty rate at the low end for all the agreements related to CDMA/TDMA technology is 7.9% and the royalty rate at the low end for the all the agreements related to GSM/GPRS/EDGE technology is 2.8%. [Doc. No. 150 at 9–13; Doc. No. 135–2, *Gemini Expert Report* at 31, 44.] However, the Federal Circuit in *Uniloc* made clear that a faulty damages analysis cannot be cured "simply by asserting a low enough royalty rate." 632 F.3d at 1320. For Mr. Gemini to use 7.9% and 2.8% as his starting points in determining the reasonable royalty, he must establish that the licenses are comparable. *Lucent*, 580 F.3d at 1325; *LaserDynamics*, 2011 WL 7563818, at *3–4, 2011 U.S. Dist. LEXIS 42590, at *10–11. Moreover, the Court notes that the 7.9% and 2.8% figures are not royalty rates from the individual "significant patent agreements" but appear to be the rates from the agreements in aggregate, separated only by whether they relate to CDMA/TDMA technology or GSM/GPRS/EDGE technology. [*See* Doc. No. 135–2, *Gemini Expert Report* at 31 (explaining that the "significant patent agreements" contain royalty rates ranging from 0.75% to 6.50% of HTC's revenue base).] This would appear to make Mr. Gemini's job more difficult because for his analysis to be sound, he would have to show that these two categories of licenses—which would appear to be essentially two worldwide licenses between HTC and multiple technology companies covering thousands of patents—are economically comparable to the license at issue in this case, a domestic license for two patents. These would appear to be radically different agreements even if they cover technology somewhat related to the technology covered by the patents-in-suit. *See Lucent*, 580 F.3d at 1328.

In sum, because Mr. Gemini has not provided any evidence or analysis showing that the "significant patent agreements" are economically comparable to the license that would be reached at the hypothetical negotiation, the Court **EXCLUDES** Mr.

Gemini's testimony to the extent he relies on the "significant patent agreements" in determining the reasonable royalty that would have been reached at the hypothetical negotiation. Because the Court excludes this portion of Mr. Gemini's testimony, the Court will entertain appropriate motions to repair and prepare the record suitable for trial on the issue of damages. *IP Innovation,* 705 F.Supp.2d at 691.

### E. Mr. Gemini's Enhanced Royalty Rates

■ HTC argues that Mr. Gemini applies enhanced royalty rates for certain groups of claims without any factual support. [Doc. No. 135 at 13–15.] In his report, Mr. Gemini concludes that the reasonable royalty for the functionality covered in the original claims of the '304 Patent—Android Market and Windows Market—would be 1.0%; the reasonable royalty for the additional functionality covered in the claims of the '591 Patent— camera phone capabilities—would be 0.1%; and the reasonable royalty for the additional functionality covered in the claims of the '304 Patent that were added during reexamination—web browser capabilities—would be 0.5%. [Doc. No. 135–2, *Gemini Expert Report* at 36–44.] HTC argues that Mr. Gemini's report contains no explanation at all of how he arrived at these additional 0.1% and 0.5% figures. [Doc. No. 135 at 13–15.]

First, as an initial matter, the Court notes that there is nothing inherently improper with what Mr. Gemini did. The hypothetical negotiation is supposed to occur just before infringement began. *See Lucent,* 580 F.3d at 1324. Here, because there are three different effective dates for the asserted claims, there are three differ-

ent dates when DataQuill asserts that infringement began: September 2008, October 27, 2009, and April 13, 2010. [*See* Doc. No. 135–2, *Gemini Expert Report* at 6–7.] Therefore, there should be three different hypothetical negotiations. *See Lucent,* 580 F.3d at 1324. In addition, DataQuill contends that the asserted claims that were added during the reexamination proceedings cover additional features of the accused products that were not covered by the original claims in the '304 Patent. [*See* Doc. No. 135–2, *Gemini Expert Report* at 5.] Therefore, Mr. Gemini may apply different royalty rates to the different infringements that occurred at the three different times.[7] *See Applied Med. Res. Corp. v. United States Surgical Corp.,* 435 F.3d 1356, 1362 (Fed.Cir.2006) ("Because the determination of reasonable royalty damages is tied to the infringement being redressed, a separate infringement beginning at a different time requires a separate evaluation of reasonable royalty damages.").

Further, despite HTC's contention to the contrary, Mr. Gemini's report does explain how he arrived at the additional 0.1% and 0.5% figures. Mr. Gemini's report explains that these figures are based on DataQuill's contention, supported by the testimony of their technical expert Dr. Van der Weide, that the asserted claims of the '591 Patent and the asserted claims of the '304 Patent that were added during reexamination covered additional functionality of the accused products, specifically camera phone capabilities and web browser capabilities. [Doc. No. 135–2, *Gemini Expert Report* at 5, 36–44.] Mr. Gemini explains that he reviewed materials showing the importance of these capabilities to the HTC devices, [*id.* at 16–19], and in

---

7. HTC points out that all of the asserted claims share the exact same specification. [Doc. No. 167 at 7.] However, it is unclear why that is relevant to this issue because

infringement is determined by the claims of a patent, not by its specification. *See Markman,* 52 F.3d at 976.

consideration of their importance and what would be the likely result if the devices did not have these capabilities, he determined what the royalty rate should be for the additional functionality. [Doc. No. 135–2, *Gemini Expert Report* at 5, 36–44.]

■ HTC's primary criticism of Mr. Gemini's analysis appears to be that Mr. Gemini was unable to specifically state during his deposition whether certain functions of the HTC devices infringed the asserted claims. [Doc. No. 135 at 13–15.] For example, Mr. Gemini could not answer whether the use of Gmail on the accused devices infringes the patents-in-suit. [*Id.* at 13.] Based on this, HTC argues that Mr. Gemini has no idea what functionality actually infringes the asserted claims. [*Id.*] However, Mr. Gemini is not DataQuill's technical expert. Mr. Gemini relied on the assertions of DataQuill's technical expert Dr. Van der Weide that the asserted claims of the '591 Patent and the asserted claims of the '304 Patent that were added during reexamination covered additional functionality. [Doc. No. 135–2, *Gemini Expert Report* at 5.] An expert is entitled to offer opinion testimony based on any materials "of a type reasonably relied on by experts in the particular field." *See* Fed. R. Civ. 703. It is routine and proper for a damages expert in a technical patent case to rely on a technical expert for background. *See, e.g., Eolas Techs., Inc. v. Microsoft Corp.,* 270 F.Supp.2d 997, 1006–07 (N.D.Ill.2003); *see also United States v. 1,014.16 Acres of Land,* 558 F.Supp. 1238, 1242 (W.D.Mo. 1983) ("An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion."). HTC cites no authority to the contrary. Moreover, HTC might dispute whether the asserted claims actually cover this additional functionality, but the proper recourse then is for HTC to present contrary evidence

and attack Mr. Gemini's and Dr. Van der Weide's testimony on cross-examination rather than for the Court to exclude Mr. Gemini's testimony. *See Primiano v. Cook,* 598 F.3d at 564; *see also Micro Chem.,* 317 F.3d at 1392 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."). Accordingly, the Court declines to exclude Mr. Gemini's testimony on the grounds that he has no factual support for his additional 0.1% and 0.5% royalty rates.

**F. Entire Market Value Rule**

■ HTC argues that Mr. Gemini improperly uses the total revenue of the accused products as his royalty base in violation of the entire market value rule. [Doc. No. 135 at 17.] In response, DataQuill argues that the entire market value rule does not apply to the present case, and that even if it did apply, the rule has been satisfied. [Doc. No. 167 at 23–25.]

■ "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc,* 632 F.3d at 1318 (emphasis added). "[T]he patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," or show that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Id.* (citing *Garretson v. Clark,* 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884)); *see also Lucent,* 580 F.3d at 1336–37. The paten-

tee bears the burden of proving that the entire market value rule has been satisfied. *See IP Innovation*, 705 F.Supp.2d at 690; *see also Lucent*, 580 F.3d at 1336 ("the patentee must prove that the patent-related feature is the basis for customer demand." (quotation marks omitted)). A damages expert that improperly utilizes the entire market value rule in calculating the reasonable royalty should be excluded. *See, e.g., IP Innovation*, 705 F.Supp.2d at 689–91.

DataQuill argues that the entire market value rule does not apply because the patents-in-suit do not claim a "feature" or a "component," but instead claim an entire "apparatus," and the accused HTC handsets constitute the apparatus. [Doc. No. 150 at 23–24.] DataQuill argues therefore that the infringing devices are the HTC handsets themselves not a component of the handsets. [*Id.*]

Although the Court agrees with DataQuill's contention that the patents-in-suit claim an entire apparatus, the HTC handsets, and not a component part, the Court disagrees with DataQuill's contention that the patents-in-suit do not merely claim a "feature" of the handsets. The HTC handsets are complex products with multiple features that are clearly not claimed by the patents-in-suit, such as the ability to make phone calls and the ability to send and receive text messages. [*See generally* Doc. No. 149–4, *Van der Weide Expert Report* Exs. C–D (not mentioning phone calls or text messaging during his infringement analysis).] Indeed, later in its opposition, DataQuill appears to concede that the devices have both infringing features and non-infringing features. [*See* Doc. No. 150 at 24 ("The patented structure and features that meet the claim limitations, and unpatented structure and features, are physically part of a single device.")] The entire market value rule applies when the accused products have both patented and unpatented features. *See IP Innovation*, 705 F.Supp.2d at 689–90. The Court further notes that the application of the entire market value rule in the present case is in line with the purpose of the rule. The entire market value is based on the idea that "'[w]hen a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance. He must separate its results distinctly from those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated.'" *Lucent*, 580 F.3d at 1337 (quoting *Garretson v. Clark*, 111 U.S. at 121, 4 S.Ct. 291). DataQuill does not appear to contend that its patents are for an "entirely new machine or contrivance." Indeed, DataQuill would likely have a hard time arguing that its patents represent the invention of the cell phone or even the smart-phone. The patents-in-suit only represent an improvement on an invention. Therefore, the entire market value rule applies in this case, *see Lucent*, 580 F.3d at 1337, and DataQuill can only use the total revenue of the accused devices as the royalty base if it can show that the rule has been satisfied. *See Uniloc*, 632 F.3d at 1318.

DataQuill argues that the entire market value rule has been satisfied. First, DataQuill appears to erroneously argue that there is an exception to the entire market value rule when the patented and unpatented features are both parts of a single unitary device. [Doc. No. 150 at 24.] DataQuill quotes the following language from *Rite–Hite:* "The entire market value rule has typically been applied to include in the compensation base unpatented components of a device when the unpatented and patented components are physically part of the same machine." 56 F.3d at 1538. While this statement is true, it is taken out of context. One requirement of the entire

market value is that the patented and unpatented features be part of the same machine. *See Cornell Univ. v. Hewlett–Packard Co.,* 609 F.Supp.2d 279, 286–87 (N.D.N.Y.2009) (Radar, J.) (listing the three requirements for the satisfaction of the entire market value rule); *accord. Lucent Techs., Inc. v. Microsoft Corp.,* 2011 WL 2728317, at *4–5, 2011 U.S. Dist. LEXIS 75504, at *24 (S.D.Cal. Jul. 13, 2011) (same). HTC does not appear to contest that this requirement is met in this case. However, another requirement is that the infringing feature be the "the basis for customer demand for the entire machine." *Cornell,* 609 F.Supp.2d at 286; *accord. Lucent,* 580 F.3d at 1336. HTC does contest that this requirement has been met by DataQuill.

DataQuill argues that the entire market rule has been satisfied because in conducting his analysis Mr. Gemini relied on various documents, including HTC documents, showing that the features of the patented technology are vital to HTC's competitive position in the smart-phone market. [Doc. No. 150 at 25.] In response, HTC argues that the entire market value rule has not been satisfied because DataQuill erroneously equates the importance of the feature with the different question of whether the feature creates the basis for customer demand, citing *Oracle Am., Inc. v. Google Inc.,* 2011 WL 2976449, at *4, 2011 U.S. Dist. LEXIS 80280, at *13–14 (N.D.Cal. Jul. 22, 2011) ("The fact that Java may be a critical component of Android does not justify application of the entire market value rule. Wheels are critical to an automobile, but no one would apportion all of the demand for a car to just the wheels."). [Doc. No. 167 at 10.]

However, HTC misconstrues DataQuill's assertion. DataQuill is not merely claiming that the technology is vital to the operation of the handsets, but that it is vital to their competitive position in the

marketplace. For example, in his expert report Mr. Gemini cites to articles showing that the Android Market feature is important to HTC's ability to compete with the Apple iPhone. [*See* Doc. No. 135–2, *Gemini Expert Report* at 13–14.] A product's ability to compete with other products in the marketplace is relevant to the consumer demand for the product. *See, e.g., Cornell,* 609 F.Supp.2d at 287–88 (requiring that the patentee present "market evidence" to satisfy entire market value rule). Because DataQuill has presented evidence showing the importance of the allegedly patented technology to accused devices' ability to succeed in the marketplace, it has presented sufficient evidence from which a reasonable jury could find that the entire market value rule has been satisfied. *See, e.g., Bose Corp. v. JBL, Inc.,* 274 F.3d 1354, 1361 (Fed.Cir.2001) (upholding a district judge's use of the entire market value rule based on evidence that the patented invention was integral to the overall performance and success of the accused products); *Fonar Corp. v. GE,* 107 F.3d 1543, 1552–53 (Fed.Cir.1997) (upholding a jury's use of the entire market value rule where the accused infringer's technical literature emphasized the importance of the patented feature); *see also* FED. R. EVID. 104(b). Accordingly, because Mr. Gemini's use of the entire market value rule is proper, the Court declines to exclude his testimony for using the total revenue of the accused products as the royalty base when calculating the reasonable royalty.

### G. Conclusion

In conclusion, the Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion to exclude the expert opinions of DataQuill's damages expert Joseph Gemini.

### *CONCLUSION*

1. The Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion for

partial summary judgment of non-infringement. Specifically, the Court

a. **DENIES** HTC's motion for summary judgment of no direct infringement of claims 12, 13, 44, and 45 to the extent that DataQuill alleges that infringement occurs solely due to the presence of a digital camera in the accused devices and not the presence of any third-party applications;

b. **DENIES** HTC's motion for summary judgment of no direct infringement of claims 12, 13, 44, and 45 by the "G2" accused handset to the extent that DataQuill alleges that infringement occurs when the "G2" is loaded with third-party applications;

c. **GRANTS** HTC's motion for summary judgment of no direct infringement of claims 12, 13, 44, and 45 by all the accused devices other than the "G2" handset to the extent that infringement is alleged to occur when the devices are loaded with third-party applications;

d. **DENIES** HTC's motion for summary judgment of no direct infringement of claim 83 by the "G2" handset;

e. **GRANTS** HTC's *motion for summary judgment of no direct infringement* of claim 83 by all the accused devices other than the "G2" handset;

f. **DENIES** the remaining portions of HTC's motion for no direct infringement of the '304 Patent;

g. **GRANTS AS MOOT** HTC's motion for summary judgment of no contributory infringement; and

h. **DENIES** HTC's motion for summary judgment of no induced infringement.

2. The Court **DENIES** HTC's motion for summary judgment of no willful infringement.

3. The Court **GRANTS IN PART** and **DENIES IN PART** HTC's motion to exclude the expert opinions of Joseph Gemini. Specifically, the Court

a. **EXCLUDES** Mr. Gemini's testimony to the extent he relies on the "significant patent agreements" in determining the reasonable royalty that would have been reached at the hypothetical negotiation; and

b. **DENIES** the remaining portions of HTC's motion to exclude.

**IT IS SO ORDERED.**